# In the United States Court of Federal Claims

No. 26-232
Filed: September 4, 2026
Reissued: September 21, 2026†
***SEALED***

**THE TOOTA GROUP, LLC,**

***Plaintiff,***

**v.**

**THE UNITED STATES,**

***Defendant.***

*David P.J. Timm*, Burr & Forman LLP, Washington, DC, for Plaintiff.

*Isabelle Aubrun*, Trial Attorney, *William J. Grimaldi,* Assistant Director, *Patricia M. McCarthy,* Director, and *Brett A. Shumate*, Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant.[1]

**MEMORANDUM OPINION AND ORDER**

**TAPP, Judge.**

Procurement disputes often turn on competing interpretations of what the rules require. Even straightforward acquisitions can become mired in procedural disagreements. But when an offeror cannot provide a product that meets a defined requirement—including one tied to a source-controlled item—the absence of prejudice becomes clear. In such circumstances, the outcome reflects a mismatch with the solicitation rather than bias or unfairness; whatever one

† This Opinion was originally issued under seal, (ECF No. 35), and the parties were directed to file a notice of redactions consistent with the Court's instructions. That Notice was filed on September 18, 2026. (ECF No. 38). The Court accepts all jointly proposed redactions. The sealed and public versions of this Opinion differ only to the extent of those redactions, the publication date, and this footnote.

[1] Isabelle Aubrun was counsel of record throughout the briefing process. (ECF No. 6). On August 26, 2026, Mr. Patrick Angulo entered his appearance on behalf of the United States and Isabelle Aubrun withdrew from this case. (ECF Nos. 33, 34).

thinks of the agency's criteria, the inability to meet them ultimately drives the result. That dynamic frames this protest.

This case concerns the Defense Logistics Agency's ("DLA") source-controlled procurement of certain tire inserts used in military vehicles. Plaintiff, The Toota Group, LLC ("Toota"), contends that DLA unlawfully restricted competition and mishandled the qualification process in ways that prevented it from competing to supply inserts. The Court concludes that DLA acted within permissible bounds. That conclusion does not come easily. Transparency in federal procurement is essential, and DLA's circular reasoning—offering little meaningful explanation for its constraint—is not a model of clarity or rigor. Still, even assuming flaws in DLA's procurement approach, an offeror who cannot furnish an insert conforming to the agency's stated technical boundaries cannot show that DLA's decision would have been different. Without a product that fits within the required contours, the protest is free from prejudice. Accordingly, the Court **DENIES** Toota's Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 18), and **GRANTS** the United States' Cross Motion for Judgment on the Administrative Record, (Def.'s xMJAR, ECF No. 27). The Court also **DENIES** Toota's Motion to Complete and/or Supplement the Administrative Record, (Pl.'s Mot. to Amend Record, ECF No. 19).

## I. Background[2]

Mine Resistant Ambush Protected ("MRAP") vehicles are armored personnel carriers designed to withstand ground-emplaced explosives and maintain high readiness levels. (Administrative Record ("AR") at 457, 622, ECF No. 17). A runflat insert is one component of a broader system composed of multiple interoperable parts that allows vehicles like MRAPs to continue operating after a tire puncture and deflation until the tire can be replaced, thereby enhancing the survivability of both the vehicle and the personnel operating it. (AR 458–59, 536). The insert is a high-strength ring mounted inside the wheel rim that supports the tire when deflated, allowing limited continued operation after puncture. (*See* AR 329, 439). In



U.S. Dep't of War, *MRAP Convoy,* https://www.war.gov/Multimedia/Photos/igphoto/2002013421/ (last visited Aug. 21, 2026).

[2] This opinion is indirectly related to *Toota Grp., LLC v. United States*, __ Fed. Cl. __, No. 25-1956, 2026 WL 1971080 (Fed. Cl. June 24, 2026), which involved separate procurements for runflat lubricant. Although the matters share certain factual background and overlapping legal themes, the solicitations at issue differ in material ways—including the nature of the item procured, the solicitation restrictions imposed, and the statutory authorities invoked. Where relevant, the Court adopts the compatible findings from that decision, and it has authored the present opinion to ensure consistency while recognizing the notable distinctions between the two actions.

this bid protest, Toota challenges DLA's actions in three solicitations for runflat kits, each containing similar procurement restrictions.[3]

The runflat kits at issue have one approved product manufactured by Hutchinson Industries, Inc. ("Hutchinson"), although different suppliers are approved to provide the same part.[4] (AR 440 (listing approved sources: Navistar Defense, LLC, The Shyft Group USA, Inc., Hutchinson, Oshkosh Defense, LLC)). The Administrative Record does not include any qualification-requirement testing procedures for runflat kits, aside from the use of an approved-source list. (*See id.*). It also does not contain technical data or a Technical Data Package for runflat kit solicitations.

In preparing Solicitation SPE7LX-25-R-0059 ("R-0059"), DLA issued a sources-sought notice and conducted market research to determine whether additional sources existed. (AR 72–73, 315–325, 336–430). Toota responded by offering runflat inserts manufactured by RunFlat International ("RFI"), which was not an approved source. (AR 441). Because DLA did not possess technical data, it stated that vendors could submit alternate offers but required any alternate offeror to provide a complete data package, including data for both the approved part and the alternate part from the vendor. (AR 402). DLA further explained its rationale for limiting the procurement to approved sources in a Justification and Approval ("J&A") executed on December 17, 2025. (AR 439–44). The J&A stated that the Government does not own the data or rights needed to purchase the part from additional sources, did not initially acquire those rights, and that obtaining or reverse-engineering the data would be uneconomical. (AR 440 (also identifying ND Defense, SAF-Holland, Oshkosh, The Shyft Group, and Hutchinson as the only approved sources possessing necessary data)). As a result, DLA explained that any vendor-offeror seeking award under Solicitation R-0059 would need to supply the product of an approved source.[5] (AR 440).

---

[3] SPE7LX-25-R-0059; SPE7L7-26-Q-0163; SPE7L7-26-Q-0492. (Compl. at 2 n.2).

[4] Although the Administrative Record does not explicitly require the runflat inserts to be manufactured by Hutchinson, Toota vigorously assert as much throughout their Complaint and Motion for Judgment on the Administrative Record. (*See* Compl. at 7 ("DLA will only accept one brand of Runflat kit, NSN 2640-01-563-1421, a Hutchinson Industries, Inc. ("Hutchinson") product."), 15 ("[T]he only approved part for each is manufactured by Hutchinson."); Pl.'s MJAR at 22 ("Although there are several approved sources, the others are suppliers with unique part numbers but ultimately the same Hutchinson part.")). Because the United States does not dispute this characterization, and the record as a whole supports this inference, the Court adopts it for clarity. (*See* AR 443 (listing Hutchinson as manufacturer), 665 (indicating Hutchinson's self-description as "actual manufacturer of the item")).

[5] Solicitation R-0059 incorporated Procurement Notes L04 and M06, which allow submission of either the exact approved product or an alternate product. (AR 372–373, 443). For alternate offers, DLA reiterated that, because it lacks technical data for the runflat inserts, the offeror must

For Solicitation SPE7L7-26-Q-0163 ("Q-0163"), DLA documented urgency based on MRAP readiness requirements and [redacted]. (AR 477). DLA waived synopsis requirements due to "urgency." (AR 482). Within the Simplified Emergency Procurement Authority ("SEPA") justification, DLA included the following statement:

> a) MRAP b) Yes, [redacted] [Backorders]: [redacted] . . . 2 e) [redacted], MRAP are a highly deployable weapons system and must maintain a high level of readiness. In order to [redacted] and 8a set aside delays, every step of the acquisition must be expedited. [redacted]. [National Stock Number] on SEPA Listing (Attached).[6]

(AR 477 (alterations added)).

The record reflects two avenues for unapproved sources: submission of a Source Approval Request ("SAR") or submission of an alternate offer. (*See, e.g.*, AR 459, 630). Each solicitation included a provision specifying the information required for alternate offers and explaining that, if alternate offers are not evaluated for the current procurement, an offeror may request evaluation of an alternate product for future procurements. (AR 522, 716). The provision further states that the level of technical data available to the United States for evaluating an alternate product—and the corresponding level of data that must be furnished—will be identified in the item description or through correspondence. (AR 522, 716).

Relevant to this protest, Toota submitted an alternate offer under Solicitation Q-0163.[7]

---

provide a complete data package including data for both the approved and alternate part. (AR 402). DLA concluded that vendors would need to provide the approved source's product because it does not have sufficient technical data to approve alternate offers. (AR 443). After Toota filed its complaint, DLA refrained from award under the solicitation. (Def.'s xMJAR at 6).

[6] There is no separate attachment in the record despite the statement that one exists. (AR 477).

[7] Toota did not submit alternate offers for Solicitation R-0059 or Solicitation Q-0492 but has indicated an intent to do so in the future. (Pl.'s MJAR at 9). In addition to Q-0163, Toota also states it has submitted alternate offers on several other solicitations that are not at issue in this protest. (*Id.* ("Toota has submitted AOs for SPE7LX25U3700, SPE7L725T2600, SPE7L125Q2255, SPE7L725Q2190, and SPE7L726Q0163.")).

[redacted]

(AR 525).

DLA reviewed the submission, and the engineering team determined that it was not technically acceptable. (AR 584, 625–30). DLA stated that the alternate product was not from an approved source, did not match the width dimension of the approved part, and did not have the same form because the approved insert is made of rubber, while Toota's submission was made of a hard plastic composite. (AR 663). DLA also explained that the Government does not own the technical drawing for the item and that an alternate offer must meet all dimensional, component, and system-level requirements. (*Id.*). Because Toota's submission did not include information confirming compliance with these requirements, DLA rejected the alternate offer. (*Id.*). Toota brought this protest, and the parties subsequently moved for judgment. (Compl.; Pl.'s MJAR; Def.'s xMJAR).

## II. Analysis

### *A. Motions for Judgment on the Administrative Record*

The parties present divergent views of DLA's procurement approach. Toota contends that DLA's reliance on an approved-sources list amounts to an unlawful qualification requirement under 10 U.S.C. § 3243, largely relying on various GAO decisions, as well as this Court's decision in *Rotair Aerospace Corp. v. United States*, 173 Fed. Cl. 187, 202 (2024). (Pl.'s MJAR at 36–44 (citations omitted)). Toota argues that DLA's asserted lack of technical data cannot justify restricting competition without first complying with the statutory procedures governing qualification requirements, nor can it excuse the agency's failure to provide meaningful avenues for alternate sources to compete. (*Id.* at 41–46). The United States responds that the approved-source restriction is an intrinsic performance requirement tied to MRAP compatibility rather than a qualification requirement, and that DLA's lack of technical data rights lawfully supports its invocation of 10 U.S.C. § 3204 and FAR 6.302-1. (Def.'s xMJAR at 15–16 (citing *Oracle America, Inc. v. United States*, 975 F.3d 1279, 1294 (Fed. Cir. 2020))). The United States

further maintains that Toota's alternate offer was reasonably rejected for failing to meet the solicitation's technical requirements and thus, in any event, Toota cannot demonstrate prejudice. (*Id.* at 17–18).

Resolving Toota's protest requires determining which statutory framework governs DLA's procurement and whether the agency's actions comport with the obligations imposed by that framework. At its core, the dispute turns on three interrelated questions: first, whether DLA's use of an approved-sources list for the runflat kit constitutes a permissible solicitation requirement or an impermissible qualification requirement under 10 U.S.C. § 3243; second, whether DLA may rely on its asserted lack of ownership of the technical data for the approved part as a lawful basis for restricting competition; and third, whether the Competition in Contracting Act ("CICA") and FAR Part 9 required DLA to undertake additional steps to facilitate alternate offers, such as providing qualification procedures, investigating available testing methods, or otherwise enabling non-approved sources to compete. Although the Court does not endorse the circular nature of DLA's explanation, that concern alone does not render the agency's reasoning irrational, and even if it did, Toota's showing amounts to understandable frustration with the process rather than the prejudice required to disturb a procurement. On that basis, Toota's Motion for Judgment on the Administrative Record must be denied.

### 1. Standard of Review

Under 28 U.S.C. § 1491(b)(4), the Court reviews agency procurement decisions under the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Pursuant to that framework, "the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013). As the Federal Circuit has explained, APA review generally proceeds along two lines: the Court may find that the agency's decision lacked a rational basis or support in the record, or that the agency violated a statute or regulation in the procurement process. *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1357 (Fed. Cir. 2009). To obtain relief, a protester must show not only that the agency acted unlawfully or arbitrarily, but also that the error was prejudicial. 720 F.3d at 907.

This standard is "highly deferential." *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008). Under the arbitrary-and-capricious standard, the Court's review is narrow and focuses on whether the agency considered the relevant factors and avoided a clear error of judgment. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974). The Court may not substitute its judgment for that of the agency, but the agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). The protester's burden is "particularly great" because contracting officers are afforded substantial discretion. *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 380 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

In reviewing procurement decisions, the Court applies a presumption of regularity and does not second-guess the agency's judgment. *Cleveland Assets, LLC v. United States*, 883 F.3d 1378, 1382 (Fed. Cir. 2018); *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003). Thus, where the record reveals a reasonable basis for the agency's action, the

Court "should stay its hand," even if it might have reached a different conclusion in the first instance. *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). For that reason, procurement decisions receive "highly deferential" rational-basis review. *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010).

All parties move for judgment on the administrative record under RCFC 52.1. Unlike summary judgment, "the existence of genuine issues of material fact does not preclude judgment on the administrative record." *Tech. Sys., Inc. v. United States*, 98 Fed. Cl. 228, 242 (2011). Instead, the Court considers whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Protection, Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).

**2. Qualification Requirements**

A qualification requirement is "a requirement for testing or other quality assurance demonstration that must be completed by an offeror before award of a contract." 10 U.S.C. § 3243(a). Section 3243 obligations arise only when an agency has established a qualification requirement. When such a requirement exists, § 3243 imposes several baseline duties. First, § 3243(b)(2) obligates the agency to specify in writing and to make available upon request all standards a prospective offeror must satisfy to become qualified. Second, § 3243(b)(4) requires the agency to provide any prospective offeror, again upon request and on a reimbursable basis, a prompt opportunity to demonstrate its ability to meet those qualification standards. Third, § 3243(c)(3) provides that a prospective offeror may not be denied the opportunity to submit an offer solely because it is not on a qualified list, so long as the offeror demonstrates that it meets the qualification requirements or can meet them before award. These statutory duties apply only if the agency has, in fact, established a qualification requirement within the meaning of § 3243(a).

Toota challenges DLA's procurement framework, arguing that its source-controlled approach operates, in substance, as a qualification requirement. (Pl.'s MJAR at 36–40). As stated above, Solicitation Q-0163 invited alternate offers and required offerors to submit a "complete data package including data for the approved and alternate part." (AR 492). Toota submitted an alternate offer and was the lowest-priced offeror, but DLA rejected the offer as technically unacceptable because the product did not match the approved source's "fit" or "form." (AR 584, 663). Toota claims that meeting DLA's standards is virtually impossible because it cannot provide the relevant technical data for an offeror to supply a compliant product. (Pl.'s MJAR at 39). DLA procures runflat kits through a "source-controlled" process rather than a traditional sole-source award. (AR 439–40). Under this approach, only designated approved sources may furnish the required item, and those sources must supply Hutchinson-manufactured runflat kits. (AR 402, 443, 492, 675).

The United States responds that the approved-source restriction is not a qualification requirement under § 3243, as that section applies only to extraneous qualification systems—such as qualified manufacturers lists—and not to solicitation-specific minimum requirements intrinsic

to the agency's needs. (Def.'s xMJAR at 15 (citations omitted)). According to the United States, compatibility with the MRAP system is intrinsic to the procurement, and absent technical data, the only way to ensure compatibility is to procure from approved sources. (*Id* at 17 (citing AR 439–444)). The United States also asserts that DLA properly invoked § 3204(a)(1) because the required item is available only from a limited number of responsible sources and that the J&A satisfies FAR 6.303-2(b)(9)(i). (*Id.* at 12).

The record shows, and the United States does not dispute, that DLA relies on this method not because it has independently verified the technical basis for the preferred runflat insert kit design, but because those kits have historically performed successfully in the MRAP platform. (AR 439–44). DLA acknowledges, however, that it does not possess the technical data or data rights necessary to understand or independently evaluate the underlying engineering that makes those kits compatible with the system, and obtaining such data would be "uneconomical." (AR 440–43, 1–2). In short, DLA procures the item in the only manner it believes feasible: it requires Hutchinson kits because *they work*, while simultaneously conceding that it cannot explain with technical specificity why they work or assess whether an alternate product would do so.

According to Toota, if DLA limits competition to approved sources that can furnish Hutchinson-manufactured runflat kits, then DLA has effectively imposed a pre-award condition that only certain entities can satisfy. (Pl.'s MJAR at 36–37). The record shows that DLA does permit alternate offers—at least nominally. (AR 472, 492). The difficulty, and the core of Toota's objection, is that any alternate offer must still demonstrate that its product is the Hutchinson kit or is identical to it in all material respects. (AR 372–73 (incorporating Procurement Note L04, which permits an offeror to submit either the exact approved item or an alternate product for evaluation)). In other words, DLA invites competition only to require that any competitor prove that its product is the incumbent product. (AR 402 ("The alternate offeror is required to provide a complete data package including data for the approved and alternate part for evaluation.") (capitalization removed)). Because DLA lacks the technical data necessary to evaluate functional equivalence, the agency requires alternate offerors to submit a complete data package for both the alternate item and the approved item. (*Id.*). As a result, the pathway for non-approved sources is illusory: alternate offerors may participate, but only if they can show that their product is the incumbent product, a showing they cannot make without proprietary data that DLA concedes it does not have. Toota argues that DLA's process effectively operates as a qualification requirement by imposing a pre-award demonstration obligation squarely within § 3243's definition, regardless of how DLA labels it. (Pl.'s MJAR at 36).

In support of its position, Toota largely relies on *Rotair,* where the Court upheld DLA's sole-source procurement after the Army certified that it did not possess the technical data or data rights necessary to compete the parts. *Rotair Aerospace Corp.,* 173 Fed. Cl. at 200. There, the record included determinations stating that "the data needed to acquire this part competitively is not physically available" and that "the rights to use the data needed to purchase this part from additional source(s) are not owned by the Government." *Id*. In that case, DLA's J&A explained that technical data "is not available and cannot be developed to permit full and open competition." *Id*. The Court held that DLA reasonably relied on the Army's representations and was not required to undertake "all possible investigatory steps" into historical data rights, only a reasonable inquiry. *Id*. at 199–200. Because Boeing was the only approved source possessing the

necessary proprietary data, the Court concluded that DLA's sole-source decision complied with CICA. *Id.* at 201.

The principles from *Rotair* inform the analysis here, though the posture differs. As in *Rotair*, DLA asserts that it does not possess the technical data for the runflat inserts and therefore cannot evaluate alternate products without a complete data package, including data for the approved part. (AR 402). Under *Rotair*, an agency may reasonably rely on such representations when determining whether competition is feasible. 173 Fed. Cl. at 198. But unlike *Rotair*, these procurements are issued as competitive solicitations rather than a sole-source award. (AR 630); 173 Fed. Cl. at 191. Despite the apparent competition, the record reflects that Toota can identify the required item but cannot reverse engineer the approved source's product without access to proprietary data that DLA acknowledges it does not possess. (AR 441, 663). Whether DLA's approach of inviting alternate offers while requiring data only an approved source can provide constitutes a reasonable application of its limited data constraints must therefore be evaluated under the same deferential APA standard, but in the context of a solicitation that nominally seeks competition.

The Federal Circuit has distinguished extraneous qualification requirements from intrinsic requirements. In *Oracle*, the Federal Circuit held that the challenged solicitation requirement was not a "qualification requirement" because it did not impose an extraneous, pre-award testing or quality-assurance demonstration of the type regulated by Congress. *Oracle Am., Inc.,* 975 F.3d at 1294. Instead, the requirement functioned as an intrinsic performance specification tied directly to the agency's operational needs and the offeror's ability to perform on the required schedule. *Id.* at 1293. The Court explained that § 3243 distinguishes between external prerequisites as requirements unrelated to the specific procurement, and solicitation-specific performance criteria that ensure the contractor can meet the agency's demands from the outset. *Id.* Because the challenged provision assessed whether an offeror's existing capabilities could satisfy the solicitation's minimum technical and security posture within the required timeline, the Federal Circuit concluded that it was an ordinary responsibility or technical-capability criterion, not a statutory "qualification requirement." *Id.* at 1293–94. Accordingly, the requirement did not trigger § 3243's various obligations. *Id.* at 1294.

On its face, the requirement that offerors supply runflat inserts from an approved source is not a "requirement for testing or other quality assurance demonstration" under § 3243(a). Rather, DLA explains that the approved-source condition is inherent to the procurement because the agency lacks the technical data necessary to evaluate alternate products and must ensure compatibility with the MRAP system. (AR 439–444, 492, 675). As DLA puts it, it "physically does not have in its possession sufficient, accurate, or legible data to purchase this part from other than current source(s)." (AR 440). In that posture, the approved-source limitation functions as a minimum performance requirement grounded in engineering determinations and the Government's lack of data. (*See* AR 1–2). Toota relies on *Rotair* to argue that restricting competition to approved sources necessarily creates a qualification requirement, but *Rotair* involved an actual qualification requirement subject to § 3243's procedural safeguards. 173 Fed. Cl. at 202. Here, by contrast, the approved-source condition is not an extraneous qualification hurdle layered onto the procurement; it <u>is</u> the procurement. Although DLA's reasoning risks circularity—requiring an approved source because only approved sources are acceptable—the

statutory framework does not convert that limitation into a § 3243 qualification requirement. Accordingly, § 3243 does not apply.

Toota claims that the record contains indications that DLA's explanation for rejecting Toota's alternate offer based on differences in "fit" or "form" presupposes access to technical characteristics that DLA elsewhere claims not to possess. (Pl.'s MJAR at 44). Although this apparent inconsistency understandably causes Toota to question the coherence of DLA's procurement approach, the concern is not borne out by the facts. DLA's rejection did not depend on proprietary engineering data; as the United States notes, it rested on plainly observable discrepancies. (Def.'s xMJAR at 8). Toota's proposed runflat, manufactured by RFI, was visibly constructed from a different material and had an incorrect width. (AR 663–64). These differences were apparent to the naked eye and required no specialized testing or technical data to identify. A lay comparison illustrates the point. If a solicitation seeks AA batteries, an offeror cannot satisfy the requirement by supplying AAA batteries and then argue that the agency lacks the technical specifications necessary to prove the difference. The mismatch is self-evident. So too here: DLA did not need Hutchinson's proprietary data to determine that Toota's product was not the approved item. The agency's conclusion rested on straightforward physical differences, not on any hidden or inaccessible technical characteristics. (*See* AR 663–64).

Toota's frustration with DLA's procurement framework is understandable. The agency's reasoning appears self-reinforcing: DLA rejects Toota's offer because it does not supply the exact runflat kit, yet simultaneously acknowledges that it does not possess the technical data necessary to explain how the kit is made or why it functions as required. In effect, DLA demands that offerors replicate a product whose underlying engineering it cannot describe and whose proprietary data it does not control. The situation resembles the experience of many vendors in highly specialized supply chains where the incumbent manufacturer's design has become the de facto standard, and similar vendors are told they must match that standard precisely even though the technical blueprint is unavailable. That dynamic may be commercially familiar, but in the procurement context it understandably leaves Toota feeling as though it is being asked to meet a requirement that cannot realistically be satisfied. Nonetheless, because these constraints are intrinsic to the solicitation itself rather than freestanding qualification requirements, § 3243 does not apply.

### 3. CICA, 10 U.S.C. § 3204, and FAR Part 6

Beyond Toota's issues with the wrongful imposition of qualification requirements, it goes on to argue that DLA was still required to better justify any departure from the baseline policy of full and open competition. (Pl.'s MJAR at 45–48). The United States responds that CICA expressly permits other-than-competitive procedures when an item is available only from one or a limited number of responsible sources, and that DLA fully complied with those requirements by documenting its lack of technical data, identifying the approved sources, and certifying the justification as complete and accurate. (Def.'s xMJAR at 10–14). The record supports the United States' view that DLA satisfied CICA's requirements by properly invoking the statutory exception and fully documenting its justification for limiting competition.

It is undisputed that CICA generally requires agencies to justify any restriction on full and open competition. *See* 10 U.S.C. § 3201(a). According to Toota, DLA failed to comply with 10 U.S.C. § 3204 and FAR 6.302-1 because the J&A does not describe the agency's needs, does not explain why Hutchinson's part is superior to other runflat systems, and does not contain the determinations required when competition is restricted due to technical-data limitations. (Pl.'s MJAR at 45–46). Toota contends that the J&A violates § 3204(e)(2)(A) because it contains only a generic description of runflat inserts and does not articulate the United States' minimum needs. (*Id.* at 46). The United States responds that CICA expressly authorizes exceptions to competitive procedures, including when the required property is available only from one or a limited number of responsible sources. (Def.'s xMJAR at 11 (citing 10 U.S.C. § 3204(a)(1))). The United States also believes that Toota misunderstands the requirement, as the solicitation does not seek any runflat insert capable of performing the general function of a runflat insert; it seeks the approved source's exact part or an alternate conforming product. (*Id.* at 13). The United States' overarching position is that, because DLA lacks the proprietary technical data necessary to assess alternate products, the agency can only rely on approved-source items to meet its needs. (*Id.*).

The Court is not persuaded by Toota's challenge to DLA's statutory and regulatory compliance. The record demonstrates that DLA satisfied CICA's requirements for using other-than-competitive procedures. (AR 439–43). DLA prepared a written J&A, obtained proper approval, and explained that the United States does not own the technical data needed to evaluate alternate sources. (AR 440–43). The J&A identifies the approved sources, their relevant codings, and states that any vendor must provide the product of an approved source because DLA lacks the proprietary data necessary to approve alternates. (AR 443). DLA also certified, as required by FAR 6.303-2(c), that acquiring the needed data would be uneconomical. (AR 440). CICA expressly authorizes such procedures when an item is available only from one or a limited number of responsible sources, and DLA documented precisely that circumstance. 10 U.S.C. § 3204(a)(1); (AR 440). These findings adequately support DLA's determination that open competition was not feasible.

The Court likewise rejects Toota's argument that the J&A violates § 3204(e)(2)(A) by failing to articulate DLA's minimum needs. (Pl.'s MJAR at 45). Toota focuses on the J&A's general description of runflat inserts and asserts that its own product meets that description. (*Id.*). But the record makes clear that the agency's need is not defined at the level of general functionality. Rather, the solicitation requires the approved source's exact part or an alternate that conforms to that part. (*See* AR 439–44). Because DLA does not possess the proprietary technical data necessary to evaluate alternates, only approved-source items can satisfy the agency's articulated requirement; the J&A accurately reflects this constraint and adequately describes DLA's need in light of it.

Toota goes on to argue that DLA failed to make the determinations required under § 3204(b), such as whether competition would cause substantial duplication of cost or unacceptable delay. (Pl.'s MJAR at 46). Toota suggests that DLA implicitly relied on statutory authority for follow-on production of a major system but did not make the findings required under that subsection. (*Id.*). The United States responds that Toota's argument is internally inconsistent: Toota claims DLA relied on § 3204(b) while simultaneously acknowledging that DLA did not invoke that authority. (Def.'s xMJAR at 13 (citations omitted)). Regardless, DLA

explained that acquiring the necessary technical data would be uneconomical, which the United States opines independently supports the use of other-than-competitive procedures. (*Id.* at 14).

The Court also finds for the United States on this issue. Toota's position rests on the premise that DLA implicitly relied on the statutory authority for follow-on production of a major system, yet Toota simultaneously acknowledges that DLA did not invoke that subsection. (*See* Pl.'s MJAR at 46). DLA was not required to make § 3204(b) findings because it relied on § 3204(a)(1) to support its use of other-than-competitive procedures. (AR 439–44 (citing § 3204(a)(1) ("the property or services needed by the agency are available from only one responsible source or only from a limited number of responsible sources and no other type of property or services will satisfy the needs of the agency."))). The record shows that DLA explained that acquiring the proprietary technical data necessary to open the procurement to competition would be uneconomical, a rationale that independently supports its use of noncompetitive procedures. (AR 440).

Toota further contends that because DLA treated runflat inserts as commercial items, the FAR required market research that included a detailed description of the agency's needs. (Pl.'s MJAR at 46–47). Toota argues that the J&A contains no such description and that the record reflects inadequate market research. (*Id.* at 47). The United States counters that the J&A identifies the MRAP weapons system as the end use and explains that only approved-source inserts ensure compatibility in the absence of proprietary data. (Def.'s xMJAR at 13). The United States believes this satisfies FAR 12.202 because the agency's need is defined by the requirement for an approved-source part, not by general runflat functionality. (*Id.*).

It is worth noting that the United States *did* conduct market research; however, its production does not rise to the level suitable to Toota. (AR 72–73, 315–25, 336–30; Pl.'s MJAR at 46). Although Toota argues that the J&A does not contain a detailed description of the agency's needs, the record shows that DLA identified the MRAP weapons system as the end use and explained that only approved-source runflat inserts ensure compatibility in the absence of proprietary technical data. (AR 439–44). FAR 12.202 requires a description sufficient to convey the agency's functional need, and here that need is defined not by general runflat performance but by the requirement for an approved-source part; this is an unavoidable consequence of the United States' lack of technical data. The J&A reflects this constraint and reasonably documents the basis for limiting the procurement. (AR 440–41). This also aptly illustrates why courts do not substitute their judgment regarding technical issues for that of the agency. Courts are ill-suited to evaluate the functional needs of combat equipment akin to an MRAP.

Toota finally argues that DLA improperly relied on a lack of advance planning, asserting that its repeated outreach should have alerted the agency months earlier that additional competition was feasible. (Pl.'s MJAR at 47–48). The United States responds that Toota never submitted a SAR, the mandatory first step in the qualification process, and that without a SAR DLA had no basis to begin any qualification activity. (Def.'s xMJAR at 14). The Court agrees. An agency cannot be faulted for failing to initiate testing or evaluation when the offeror itself never triggered the qualification process, and it would be difficult for Toota to demonstrate prejudice in the absence of a SAR submission. The record therefore does not support Toota's claim that DLA perpetuated a sole-source environment through inadequate planning.

Ultimately, the Court concludes that Toota has not demonstrated any basis to disturb DLA's justification for using other-than-competitive procedures. The record shows that DLA properly invoked a statutory exception, documented its lack of proprietary technical data, identified the approved sources, and certified the justification as complete and accurate. Toota's challenges directed at the description of agency need, market research, advance planning, and statutory compliance do not establish that DLA acted arbitrarily, capriciously, or contrary to law. Accordingly, the Court finds for the United States.

**4. Prejudice and Injunctive Relief**

The Court does not reach its conclusion lightly. Transparency and clarity in federal procurement are essential, and DLA's reasoning, reiterating that only a particular type of product would be accepted while offering little explanation for why that limitation was necessary, falls short of the standard to which agencies should aspire. Circular justifications of this kind risk obscuring rather than illuminating the basis for restricting competition. Nevertheless, the Court is heavily persuaded by considerations of prejudice. Even assuming some irrationality in DLA's process and explanation, Toota cannot prevail because it cannot establish prejudice.

A protestor must show that any alleged "errors in the procurement process significantly prejudiced" it, and the burden "lies squarely on the plaintiff[.]" *Bannum*, 404 F.3d at 1353; *Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 288 (2024). There is "no presumption of prejudice," even where agency action is irrational. *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021). Although "multiple errors might cumulatively establish prejudice," *USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 450 (2010), a protestor must still show that correcting the errors would have increased its "chances of securing the contract[.]" *Precision Asset Mgmt. Corp. v. United States*, 125 Fed. Cl. 228, 233 (2016) (citing *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

The record demonstrates that Toota's proposed product differs materially from the approved source's item in ways that bear directly on the solicitation's technical requirements. (AR 663). Toota itself described its product as having different physical characteristics, including a different width and composition, designed to perform in a similar functional manner but not identical to the incumbent part. (AR 528–29). These differences relate to the fundamental configuration of the runflat kit and its compatibility with the MRAP system. Here, even if DLA had conducted a more robust investigation into its data rights, provided clearer qualification procedures, or drafted a more detailed J&A, Toota has not shown that its product could be found technically acceptable under any reasonable evaluation. The broader procurement framework does not alter this conclusion. Even when an agency's explanation is imperfect, relief is not warranted unless the protestor demonstrates prejudice. *Sys. Stud. & Simulation*, 22 F.4th at 998.

Nor does § 3243 alter the prejudice analysis. As *Rotair* explains, § 3243's obligations arise only when an agency has established a qualification requirement and only when the offeror has requested the relevant information or attempted to demonstrate compliance. 173 Fed. Cl. at 205–06. Thus, even assuming that DLA's reasoning about data rights is inadequately explained, any such error would not have changed the outcome. Toota's alternate offer would still have

been rejected because the product does not conform to the solicitation's technical requirements. (AR 663). Without prejudice, Toota cannot prevail on the merits of its protest.

Because Toota has not demonstrated any actionable error that materially affected its ability to compete, it likewise cannot obtain injunctive relief. Injunctions are a "drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). To obtain a permanent injunction, a protestor must show success on the merits, irreparable harm, a balance of harms favoring relief, and that an injunction serves the public interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). Because Toota has not established success on the merits, further analysis is unnecessary. Toota's request for injunctive relief is denied.

*B. Motion to Supplement the Administrative Record*

As a second matter, Toota argues that the Administrative Record is incomplete because it omits categories of materials that, in its view, were generated, considered, or available to the agency during the procurement decisions at issue. (Pl.'s Mot. to Amend Record). These include alternate offers Toota submitted in other runflat procurements, related email communications, Toota's responses to agency market research, and certain technical data attachments referenced in its pleading. (*Id.* at 1–3). Toota also contends that the record lacks agency-created or agency-maintained testing and qualification procedures for runflat products, which it believes are essential to assessing whether DLA acted arbitrarily in declining to consider Toota as an approved source. (*Id.* at 6). Toota maintains that these materials must be added through completion or supplementation to permit effective judicial review. (*Id.* at 4–8).

Courts strictly limit the circumstances under which parties may add materials to an administrative record. *Axiom Resource Management, Inc. v. United States*, 564 F.3d 1374 (Fed. Cir. 2009). Judicial review must focus on what was before the agency at the time of its decision; expanding the record risks converting the "arbitrary and capricious" inquiry into something approaching de novo review. *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005). For that reason, discovery in bid protests is sharply constrained. *Proxtronics Dosimetry, LLC v. United States*, 128 Fed. Cl. 656, 681 (2016); *see also Murakami*, 46 Fed. Cl. at 735 ("[E]xceptions to the general rule against extra-record evidence are based upon necessity, rather than convenience, and should be triggered only where the omission of extra-record evidence precludes effective judicial review.").

Parties may incorporate additional documents into the administrative record through completion or supplementation. A motion to complete the record seeks to add materials that were before the agency and are relevant to the challenged decision. *Poplar Point RBBR, LLC v. United States*, 145 Fed. Cl. 489, 494 (2019). The United States' compilation of the record carries a presumption of regularity. *Id*. Even so, when a plaintiff presents clear evidence that the agency generated or considered specific materials but omitted them, the Court may order completion. *Id*. Supplementation, by contrast, is permitted only when "necessary for effective judicial review or if the existing record cannot be trusted." *Diversified Maint. Sys., Inc. v. United States*, 93 Fed. Cl. 794, 802 (2010) (internal quotations omitted); *cf. Axiom Res. Mgmt.*, 564 F.3d at 1381. It is appropriate only in rare and exceptional circumstances, such as when the agency overlooked

relevant considerations or when there is evidence of bad faith or improper conduct. *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 339, 342 (1997). The Court may add materials only when their absence "frustrate[s] judicial review as to the ultimate question of whether [the agency action] was arbitrary and capricious." *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (citing *Axiom Res. Mgmt.*, 564 F.3d at 1379–80).

In opposition to Toota's Motion, the United States argues that Toota's request satisfies neither the standards for completing nor supplementing the record. (Def.'s Opp., ECF No. 28). It notes that none of the alternate offers Toota identifies were submitted under the solicitations challenged here, and that the record already includes the only alternate offer relevant to this protest. (*Id*. at 3–10). The United States further contends that Toota has not shown that any of the requested materials were considered by the agency personnel responsible for the protested procurements, each of which was handled by different individuals. (*Id*. at 9). It adds that Toota's market-research submissions concern a different vehicle platform and have no connection to the MRAP procurements at issue. (*Id*. at 10). As for the testing procedures, the United States explains that these are general standards for various runflat systems, not MRAP-specific protocols, and could not have been used to evaluate Toota's alternate offer given DLA's lack of technical data for the currently procured kit. (*Id.*).

The Court agrees that Toota has not overcome the presumption of regularity afforded to the agency's compilation of the record. *Poplar Point*, 145 Fed. Cl. at 494. The record already contains the solicitations at issue, the agency's stated rationale for limiting competition, the documentation supporting its determinations, and Toota's alternate offer submitted under the protested solicitation. These materials permit meaningful judicial review under the APA, consistent with the principle that review must be confined to what was before the agency at the time of its decision. *Murakami*, 46 Fed. Cl. at 735. Toota has not presented the "clear evidence" required to show that the omitted materials were actually considered by the agency in connection with the protested procurements. *Poplar Point*, 145 Fed. Cl. at 494. The alternate offers and communications it identifies relate to different solicitations handled by different personnel, and Toota provides no basis to conclude that they informed the decisions challenged here. The market-research materials likewise concern a different vehicle platform and bear no demonstrated connection to the MRAP procurements under review. The general testing procedures are not specific to the MRAP system and, given the agency's lack of technical data for the currently procured item, could not have been applied to Toota's alternate offer. Toota's assertion that these materials were merely "available" to the agency does not satisfy the standard for completion. *Axiom Res. Mgmt.*, 564 F.3d at 1379.

Supplementation is also unwarranted. Toota has not shown that the absence of the requested materials prevents effective judicial review. *See Diversified Maint. Sys.*, 93 Fed. Cl. at 802. The Court's task is to evaluate DLA's documented reasoning for the protested procurements, not to reconstruct Toota's broader history of interactions with DLA or to assess procurements not before the Court. *See Murakami*, 46 Fed. Cl. at 735. Accepting Toota's arguments would expand the scope of review beyond the challenged solicitations and invite the type of de novo inquiry supplementation is designed to prevent. *Axiom*, 564 F.3d at 1381. Nor has Toota identified any "rare and exceptional" circumstance, such as overlooked considerations or evidence of bad faith, that would justify supplementation. *See Cubic Applications*, 37 Fed. Cl.

at 342. Because the existing record allows the Court to assess whether the agency acted arbitrarily or capriciously, supplementation is not necessary. *See AgustaWestland*, 880 F.3d at 1332.

Although Toota's Motion is denied, the Court notes that inclusion of the requested materials would not alter the outcome of the Court's decision on the merits of Toota's case. The dispositive issues turn on DLA's stated justification for its procurement decisions, which is already reflected in the existing record. The additional documents would not change the Court's assessment.

## III. Conclusion

For the reasons explained above, the Court concludes that Toota has not shown that DLA acted arbitrarily, capriciously, or contrary to law. No statutory or regulatory violation is present. The source-controlled nature of the runflat insert is intrinsic to the solicitation and does not constitute a qualification requirement. DLA's evaluation of Toota's alternate offer was reasonable, supported by the record, and consistent with governing procurement standards. Any administrative imperfections, even if they existed, do not establish prejudice and therefore cannot justify judicial intervention.

Accordingly, the Court **DENIES** Toota's Motion for Judgment on the Administrative Record, (ECF No. 18), and **GRANTS** the United States' Cross-Motion for Judgment on the Administrative Record, (ECF No. 27). The Court also **DENIES** Toota's Motion to Amend the Record, (ECF No. 19). The Clerk is **DIRECTED** to enter judgment accordingly. The parties shall meet and confer and file a Joint Status Report proposing redactions to this Memorandum Opinion within fourteen (14) days of its entry to allow the Court to file a public version of the Opinion.

**IT IS SO ORDERED.**

s/ David A. Tapp
DAVID A. TAPP, Judge